**In re TOTIN CONTRACTING, INC., Debtor.**

**Totin Contracting, Inc., Plaintiff,**

v.

**West Salem Township Municipal Sewage Authority, Defendant.**

**Bankruptcy No. 01–10947.**
**Adversary No. 02–1012.**

United States Bankruptcy Court, W.D. Pennsylvania.

July 7, 2004.

Stephen J. Mirizio, Sharon, PA, and Stephen H. Hutzelman, Erie, PA, for Plaintiff.

P. Raymond Bartholomew, Hermitage, PA, for Defendant.

## OPINION[1]

WARREN W. BENTZ, Bankruptcy Judge.

### Background and Procedure

On April 12, 2000, Totin Contracting, Inc. ("Totin") and the West Salem Township Municipal Sewage Authority (the "Authority") executed a contract for the construction of certain sanitary sewers in Mercer County entitled "Contract #3— South Sanitary Sewers" (the "Contract" or "K–3"). The original contract price was $1,008,455. The Contract is Contract #3 among 5 separate numbered contracts between the Authority and others for work in contiguous areas. Substantial completion occurred March 13, 2001, and the new sewer system was turned over to the Authority. There remained some surface restoration work to do.

The original notice to commence work was May 15, 2000 and the completion due date was November 20, 2000. Hence, completion was late. The Authority withheld payments otherwise due, and Totin advised that it would stop its surface restoration work, being unable to work without funds. Each party asserted claims, including Totin's claim for amounts due but unpaid under the Contract, and damages for delays caused by the Authority, and the Authority's claims for late performance and costs of correcting faulty work.

Totin filed Chapter 11 bankruptcy on May 4, 2001.

About May 1, the parties began negotiations and reached an agreement set forth in a "Memorandum of Understanding" dated May 15, 2001, and approved by this Court the same day. The Memorandum of Understanding provided for various payouts, and for Totin to finish the surface restoration work by June 15, 2001.

Totin requested an extension to June 20, 2001 because of adverse weather and gave notice to the Engineer on June 1 that all work would be done by June 15, 2001. We take it that the work would be finished by June 22. The parties thereafter disputed whether Totin had completed the work.

On February 20, 2002, Totin filed its Complaint, thereafter amended, against the Authority commencing the within adversary proceeding demanding damages in the amount of $238,535.94 plus interest and punitive damages. The Authority filed its Answer alleging numerous counterclaims, totaling $119,377.89, with a net amount due the Authority of $3,472.24 plus additional attorney and engineering fees to be incurred. The Authority stated that it is asserting its claims *only* as setoffs.

On April 22, 2004, prior to trial, in connection with motions for summary judgment on both sides, this Court entered a MEMORANDUM AND ORDER relative to the May 15, 2001 Memorandum of Understanding; the Memorandum and Order provided in part as follows:

> The Memorandum [of Understanding] was a settlement of the rights, claims, obligations and duties under the original Contract. Both parties compromised their respective positions and agreed to accept final performance in accordance with the terms of the Memorandum, in satisfaction of the Contract.
>
> The parties are, by their agreement to the terms of the Memorandum, foreclos-

---

1. This Opinion constitutes the Court's findings of fact and conclusions of law. Jurisdiction of the Court is not contested and is established under 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2).

ed from raising issues or obligations that are resolved by its terms.

The Authority's claim for liquidated damages was settled and resolved by the Memorandum for the amount of $43,500. It is not entitled to any further credit for additional engineering or legal fees. Totin relinquished any claims for additional monies, if any, that it might have claimed under the Contract for any extra work or for expenses due to delays or increased costs that may have been caused by the Authority's failure to properly perform its obligations.

Totin's claim is now limited to (1) the remaining unpaid balance of $14,000 under ¶ 5 of the Memorandum subject to adjustments, plus or minus, for amounts that the Authority was required to expend to complete work, if any, that Totin failed to complete, and (2) for final adjusting quantities, including an upward adjustment for additional paving. The facts necessary to determine the amount of the adjustments are in dispute and must be the subject of an evidentiary hearing.

Notice to proceed had been issued May 15, 2000. On June 8, 2000, the reports show that the material was on the job but there was still a holdup because of negotiations between the Authority and Penndot. Some time later, Penndot agreed to allow open cuts across its roads. The Authority therefore required the contractor to excavate across the roads, install the sewer, backfill with stone, and repave the road. Such work was required in the original bid and Contract, but only to a minor extent, and was greatly expanded by this change. This mostly eliminated the boring work, wherein a pit is dug on each side of the road, and a hole is bored laterally under the road to accommodate a steel pipe through which the sewer is installed.

Resolution of this issue by the Authority absorbed valuable time at the beginning of the job, and Totin may have had a valid claim for delay. Totin gave that up, however, in its attempt on May 15, 2001 to settle the entire job and get it behind him in the Memorandum of Understanding.

This Court's Order was that Totin thereby gave up any claim he had for delay, and gave up $43,500 to the Authority for liquidated damages. The Authority got $43,500 but gave up claims for past and future liquidated damages. The job was "substantially" done and almost completely finished and the Memorandum of Understanding was intended to be a final settlement.

At trial, the Authority sought to introduce evidence of subsequent additional counsel and engineering fees of some $60,000. This Court sustained an objection to such evidence.

This Court would not, even if the evidence were admitted, have allowed $60,000 in counsel and engineering fees to resist payment of monies clearly owing as to certain paving, and as to setoff rights over the minor resurfacing deficiencies that remained.

The Memorandum of Understanding did several other things: (1) It committed Totin to finish the work by June 15, 2001.(2) It recognized that in accordance with the Contract, "there will be a Change Order to accomplish final adjusting quantities" as may be determined by Totin and the Authority's consulting engineer and that included within those quantities is anticipated to be a change related to additional paving in the amount of approximately $34,000. (3) It provided that the Contract was still applicable. (4) It provided for approval of four Change Orders which had been long pending totaling $37,423.70. (5) It provided for payments to Totin of $33,000 presently; $33,000 on June 1 and a

final payment of $34,000 on June 18, providing the work is finished; and $47,000 direct to Totin's subcontractors. These amounts were paid, except that $14,000 was withheld from Totin.

The Authority filed a motion for relief from the automatic stay of 11 U.S.C. § 362 asserting that Totin had not finished homeowner lawn and other repairs and that it wanted to terminate the Totin Contract and pursue the Surety. The motion was granted on June 19, 2002 without any determination whether the Authority had legal grounds for such termination. The Authority subsequently terminated the Contract by notice to Totin.

### Procedural Issue

The Authority urges that the Complaint as brought by Totin to recover amounts due under the Contract that Totin did not specifically allege the $54,850 paving claim or the $14,000 claim, that 11 U.S.C. § 108(a) bars claims filed over two years after the bankruptcy case was filed, and that two years have expired. First, we conclude that any claims and counterclaims or offsets necessary to determine amounts due under the Contract are properly before the Court. Second, 11 U.S.C. § 108(a) imposes a two year limitation period only where the state law limitation is less than two years; where the state law limitation period is greater than two years, the longer period governs. The Complaint could, at trial, and even now, be amended if necessary. We deem such amendment unnecessary having been amply disclosed in pretrial statements and being a part of the suit on the Contract. The Complaint will be deemed amended to conform to the evidence.

### The Trial Issues

A five day trial of the factual complexities of the Contract and its performance concluded June 8, 2004, and the matter is ripe for decision.

It is appropriate to mention the cast of characters:

Totin Contracting, Inc. ("Totin"), Debtor and Plaintiff

Michael Totin, President of Totin Contracting, Inc.

West Salem Township Municipal Sewer Authority, Defendant (the "Authority")

Mark Reichard, Chairman of the Authority

Killam Associates, the engineering firm engaged by the Authority for the project

Walter Jenco, the Project Engineer assigned by Killam Associates to the job from May, 2000 to January 29, 2002

Paul Hesse, Project Engineer assigned by Killam Associates after January 29, 2002

John Jordan, Totin's paving foreman

John Runkle, representative of Sabrina Runkle Services Rendered, Inc. ("Runkle")

Ken Sherbondy, Township Road Supervisor

Steven G. Adams, Vice President of Paul C. Rizzo Associates, Engineers & Consultants

Irvin Myers, USDA Loan Specialist

The payment and workmanship claims are best treated individually:

1.  The paving, 2194 sq. yd. ($54,850 claim)

2.  11 Carnegie Street sewer repair ($2,372.49 setoff claim)

3.  218 Clarksville Road, Smith, new asphalt drive ($3,885 setoff claim)

4.  Hempfield Ave. Inlets $3,275; Hempfield Ave. 15″ CCP $3,225; Buy Rite catch basin $3,018 (setoff claims)

5. Reichard property, rip rap ($1,674.92 setoff claim)

6. Surface Restoration (setoff claims)

### 1. The Paving, 2194 square yards ($54,850 claim)

■ The contract provided for an "estimated" 1,200 square yards of paving to be paid for at the fixed rate of $25 per square yard. Totin would be paid only for the square yards of paving actually performed. Similarly, Totin would be paid for more than 1,200 square yards if he actually laid more. Thus, the 1,200 square yard figure was designated in the Contract as an "estimate;" but the unit price of $25 per square yard was fixed; so the contractor would get $25 per square yard for each square yard laid.

Similarly, the *estimated* amount for 8″ steel casing borings was 500 lineal feet at a *fixed* price of $75 per foot, or $37,500. In the Final Compensating Change Order, the 500 lineal feet was reduced to 80 feet, so the contract price was reduced by $31,500 to $6,000.

As soon as the work started, there was a substantial change. The Contract provided that the new sewers should cross certain paved roads by digging pits on both sides of the road, and then boring laterally across the road underground, so that the surface paving would not be disturbed. The Authority, through its engineer, after negotiation with Penndot, ordered that the bored crossings be changed to open cuts, followed by stone backfill, and re-paving. No change order was issued because the fixed *unit prices* were already in the Contract.

The Authority argues that Totin cannot recover for the paving work done in excess of the original contract because there was no written Change Order.

The May 15, 2001 Memorandum of Understanding, ¶ 7, commits the parties to recognition that there would be a Change Order to accomplish the "final adjusting quantities" in accordance with the original contract. That paragraph also provides "that included within those quantities is anticipated to be a change related to additional paving in the amount of approximately $34,000." Thus, the Memorandum of Understanding of May 15, 2001 commits the Authority to pay for the paving, subject only to proof of the quantity. It also commits the Authority to the interpretation of the Contract that the unit prices were fixed and the quantities were estimates.

The Authority's position that the 2,194 square yards of paving cannot be paid without a written Change Order is also belied by the practice under the Contract. The Project Engineer and the Authority previously approved Totin's Partial Payment Estimate for 2,113.28 square yards of paving in the year 2000, and paid all but the retainage without a Change Order. That seems to make it abundantly clear that no Change Order was required for changes in the quantities of the paving.

Irvin Myers testified that if Change Orders were required every time a quantity is altered, there would be several Change Orders each day—an intolerable scheme. The changes are handled by reporting them on the contractor's Partial Payment Estimate and then by the Final Compensating Change Order.

There was no Change Order for the deletion of $30,500 of boring work. Pursuant to the Authority's position, Totin should get that $30,500 even though he never did the work—an absurd conclusion.

The Final Compensating Change Order (Authority, Exhibit D–7) shows that there were 27 different categories of work. Out of that 27, there were 25 that had quantity

changes which, in turn, changed the price. There were no Change Orders for those items. The four actual Change Orders are itemized separately.

Paul Hesse testified that he prepared Exhibit D–7 and that it is part of his job to prepare the Final Compensating Change Order based upon the quantities actually installed.

After May 15, Totin completed the paving work, but received no payment nor credit for it. In accordance with the Contract and the prior practice of the parties conforming thereto, Totin on July 3, 2001 submitted a Partial Payment Estimate for 2,194 square yards of paving at $25 per square yard, being $54,850. The Contract (¶ 19.1 of the General Conditions) and past practice required the Authority's Project Engineer to respond in writing within ten days either approving payment or specifying any objections. Walter Jenco, then the Engineer on the job, did not respond, in clear violation of the Contract. He also did not forward the partial Payment Estimate to the Authority.

Totin, having gotten no response, on August 31, 2001, resubmitted the Partial Payment Request to the Engineer. Again, there was no response. Again, in violation of the Contract.

Michael Totin spoke to Walter Jenco in late summer, 2001 advising of the location of the paving. Jenco raised no objections. Jenco did not testify at trial.

In January, 2002, Jenco left Killam Associates and Paul Hesse became the Project Engineer. Hesse telephoned Michael Totin and asked for an explanation showing where the 2,194 square yards of paving was laid. Michael Totin gave an oral explanation of the streets involved. Hesse telephoned Walter Jenco on February 26, 2002, and made the notation on the call record "2194 ok per Walt."

This is a clear and unequivocal statement by the Project Engineer on the job at the time the paving was laid that Totin should be paid for the 2,194 square yards of paving. Why Hesse resolved to ignore Jenco's evaluation was not explained and cannot be explained, unless there was a mind-set between him and Reichard to "let the lawyers fight it out." The problem with that approach is that it is the Engineer who must give guidance to the lawyers as to the facts.

Hesse telephoned Mark Reichard, Chairman of the Authority Board, about the matter; Reichard instructed "if you can't justify it, let the lawyers fight it out." Even then, no notice was given to Totin as to whether or why the paving claim would or would not be paid. Michael Totin believed in the summer of 2001 that Totin would be paid in the normal course. Non-payment after passage of months enlightened him.

Hesse also telephoned Michael Totin and received an oral explanation of the location of the 2,194 square yards of paving. Hesse on March 20, 2002 sent Totin a request for a written explanation. Michael Totin had his Partial Payment Request ignored for 7 months, and having his oral explanation ignored, did not reply in writing.

Hesse testified that the paving was old and that Penndot had paved over part of it so that inspection could not reveal the extent of Totin's paving. He also testified that the most he could calculate from his file was 1,500 square yards. Yet, he never sought to credit Totin for this amount, continuing in the assertion of the Authority that nothing was owed Totin for the additional paving.

Hesse also testified that it would not be difficult to walk the site to measure the paving, but that he never did.

Michael Totin produced invoices from Dunbar Asphalt Products, Inc. for May–June, 2001 showing purchases totaling 456.4 tons of bituminous paving material for this job. There was no hint that this material was used on any other job. Michael Totin testified that the 456.4 tons of bituminous paving material converts to 2,194 square yards of paving. No one on behalf of the Authority disputed this calculation.

John Jordan, Totin's paving foreman, testified without contradiction that while he was doing Totin's paving work in May and June, 2001, including repaving of 1,700 feet of Coal Hill Road, 7 feet wide (as required by the Authority after negotiations with Penndot), there was no inspector on the job—again, contrary to the Contract. Had the Authority had an inspector on the job as required by the Contract, the present dispute would either not exist or have a different character. It is also worth observing that the Authority and its engineer never contended that the paving was not done or that the workmanship was not adequate.

It is also worth observing that Hesse never inspected the paving, and never requested that he meet Michael Totin on the site to review the paving. Totin contended that paving has varying shades of color, that the Engineer should have inspected it while it was being laid, and/or within 10 days after receiving Totin's Partial Payment Request, and that even 6 months later, an inspection, or a joint inspection, would have resolved the issue. It would appear that by then the Authority and the Engineer had set their course to "let the lawyers fight it out."

It is therefore concluded that Totin is entitled to be paid or credited for 2,194 square yards of paving at $25 per square yard, or $54,850.

### 2. 11 Carnegie Street Sewer Repair ($2372.49 Set off Claim)

The Authority seeks $2,372.49 for this item. Here, there was an old but undisclosed 12″ sewer line crossing the path of and above the new sanitary sewer. The old sewer was broken during the new excavation and before its existence was known. Totin replaced the broken section with a 10″ sewer pipe of sturdier material under the supervision of and without objection from the Authority's inspector. The new sanitary sewer was installed at the correct elevation which was below the old storm sewer and the excavation was back-filled. In December, 2001, the site was observed to be wet, with water bubbling up from below. The Authority concluded that Totin had done the work incorrectly and engaged others to excavate, replace the 10″ piece of sewer with 12″ or larger sewer, and back-filled. The Engineer testified that the short piece of 10″ pipe restricted the flow of the 12″ pipe, thus causing the water in the 12″ pipe to back up and come out the joints of the 12″ pipe and find its way to the surface. However, Totin's position was that the new sewer had been installed some months earlier, that this problem arose shortly after the adjacent homeowner's private contractor installed the "lateral" from the house to the new sewer, so that it was more likely that the lateral was improperly connected to the new sewer. The possibility that the problem was caused by improper installation of the lateral was not refuted.

Authority Chairman Mark Reichard's notes upon his investigation of the matter state "caused by incorrect storm drain connection." (See Defendant, Exhibit 32, page 7) Reichard has apparently changed his position. Ken Sherbondy also installed some of the lateral sewer drains—perhaps

this one. Yet, he and Reichard concluded it was Totin's fault.

It is also noted that no one knew the old sewer was there, nor did anyone find out where it came from or where it went, or what area it served, or what its load was; consequently, the Engineer was testifying from conjecture when he testified that the 5 or 10 feet of 10″ pipe in the 12″ line caused the problem.

Further, the Authority's on-site inspector approved Totin's original installation.

The Court finds that there is insufficient evidence to show Totin's liability and that it is more likely that the water discharge in the surface area was caused by improper installation of the lateral and the cure was effected by reconnecting the lateral properly.

### 3. 218 Clarksville Road Repairs (Smith) ($4154.85 Setoff Claim)

The Authority paid Runkle $3,885 to install a new driveway (the invoice is dated 6/7/03) and $269.85 to supply and plant 3 crabapple trees (invoice date of 9/30/02). The new sewer was across the road from the Smith property.

The Adams' Report of his March 14, 2002 investigation (Plaintiff, Exhibit 25) and his testimony dwells extensively on the Smith property.

The Authority claims that the Smiths claimed that Totin's work had cracked the plaster in their house, damaged a concrete pad (used for a driveway), damaged a concrete spillway, 3 pine trees, and a crabapple tree.

Adams inspected the site. A crabapple tree was in the area and was dead; but it and the house were too far away for any damage to have been caused by Totin. The concrete spillway was ancient; also the cracks and breaks in the concrete were ancient and deteriorated. Adams concluded that Totin's work caused no damage.

The concrete pad was under 4 to 6 inches of soil. Smith apparently had offered to allow the paving of his driveway in lieu of replacing the pad. Totin declined, asserting that the sewer work did not require him to go near the driveway and he did not go near it.

Of the 3 pine trees, one appeared to be missing, based on prior photographs. However, none of the trees were on the Smith property.

The undated Runkle Bid was apparently opened September 13, 2002 and apparently became part of the Runkle contract shortly thereafter. Totin objected to the introduction of the original Contract which Totin had subpoenaed. The objection was overruled in the interest of completing the record. The Runkle Bid shows $269.85 for "3 crab trees at 218 Clarksville Road." This item also shows up on Runkle invoice 181 dated September 30, 2002. However, the $3,885 charge for the new driveway shows up on Runkle invoice number 55 dated 6/7/2003—apparently one of the "oral" extras to the Runkle contract.

The evidence showed that the Authority paid the $269.85 and the $3,885 to Runkle for the Smith work. There was no evidence, however, that the cracks in the plaster walls of the house were not of long standing, or that anyone did damage to Smith's driveway or the crabapple trees. There was no evidence that Totin was liable. The Authority's work on the Smith property was gratuitous.

### 4. Hempfield Avenue—Catch Basin $3,275 Hempfield Avenue—15″ CPP $3,325 Buy–Rite Catch Basin—$3,018

These items may be treated together because the evidence is similar.

Installation and refurbishing of these catch basins was not a part of Totin's Contract. Nor were they added as extras. The only relation to the Totin Contract is that they were nearby. Hesse testified as to each of these items that Totin had no obligation for this work.

The owner of the Buy–Rite location wrote to Totin in the Fall of 2001 expressing his thanks for the good work. Yet, the Runkle work in supplying and installing a new catch basin, where none existed before, was invoiced 11/13/02.

This Court finds no basis of a valid claim by these landowners against anyone. The Authority's performance of this work was gratuitous.

### 5. The Reichard Property Rip–Rap ($1,674.92)

Frances Deets, one of the landowners, made a private agreement with Totin before any surface restoration work was started. The landowner accepted $528 in lieu of any work by Totin. The landowner could then buy materials, supply his own labor, and come out ahead.

Thus, it was possible for Totin as Contractor to make private contracts with the owners for the surface restoration work.

Mark Reichard, Authority Chairman, is the owner of his residence and adjacent land in the Totin Contract area. In the summer of 2000, when the sewer construction was in full swing, he made a private agreement with Totin. Totin needed a place to deposit the dirt excavated from driveway and roadway cuts. Reichard's property was the site of an abandoned stone quarry. Reichard wanted the quarry filled and agreed with Michael Totin that Totin should deposit the excavation material in the stone quarry. This was a private agreement between Reichard and Totin for their mutual benefit, and was outside the scope of the Authority's restoration obligation. Some two years later, Reichard felt he needed additional drainage and orally ordered Runkle (as an Extra to the Authority's contract with Runkle) to install rip rap on Reichard's property—to be charged to Totin. No inspection, no notice to Totin, no board minutes, and Totin pays the bill! ($369.92 on Runkle invoice # 183 dated 10/7/02, Exhibit D–16 and $1,325 on Runkle invoice # 55 dated 6/7/03, Exhibit D–17). Reichard must have grown envious seeing his neighbors get the benefit from the Authority's largesse (with Totin's money) while he was on the inside yet not enjoying the emoluments of his position. One wonders what the minutes of the Authority Board would have looked like, if they existed, where the Chairman (a very active Chairman) executed the Runkle contract (on prior *oral* board approval) and then, a month later, asks that there be an "extra" to the contract to improve his own property.

This claim, belatedly made, and not mentioned in the list sent by the Authority to Totin's surety in December, 2001, has no factual or legal support. The evidence showed that the Authority paid Runkle for the rip-rap, but there was no evidence as to why the rip-rap was needed, other than the general statement that it would improve drainage, nor why it should be the responsibility of Totin.

### 6. The Surface Restoration

The Authority determined that it should do additional surface restoration work in the fall of 2002. Hesse did a drive-by with prospective bidders. Michael Totin was not invited. The bidders estimated material quantities needed and reported same to Hesse; 500 tons of topsoil and 10,000 square yards of mulch and seed. Hesse

relied upon those estimated amounts in his bid specification.

Runkle bid $5,772.80 for the 500 tons of topsoil and $10,900 for the 10,000 square yards of mulch and seed.

The bid (Exhibit D–22) and the contract (Exhibit D–23) did not specify where the material was to be placed—only that it would "complete the construction of Restoration of Contract # 3."

Runkle's Invoice # 181 of 9/30/02 simply states:

"3. Supply and install/grade topsoil (2″
  nominal depth). . .       $ 5,772.80
4. Supply and install seed and mulch. . .  $10,900.00"

Runkle finished the work (except for one deletion) and billed by invoice # 181 dated 9/30/02. Runkle was then instructed orally to do improvement work on an additional 17 properties. The oral instruction was treated as a Change Order. Runkle's invoice # 183 of 10/7/02 shows an additional 17 properties where work was done, but does not say what was done.

The Totin Contract only obligated Totin to restore the affected properties to their preconstruction condition. Runkle's written bid, on which his contract was based, provided that Runkle would provide 500 tons of topsoil to "2″ nominal depth" and 10,000 square yards of seed and mulch. The Runkle contract ambiguously provided that Runkle would "complete the construction of Restoratior of Contract 3." Runkle invoiced and was paid for the topsoil and the mulch as Runkle had bid. However, there was no testimony that the labor and material supplied by Runkle was the minimum necessary to satisfy Totin's obligations under Contract 3. Four or five of the properties were not even within the boundaries of the Totin Contract. The Authority sought to rehabilitate the Runkle invoice by Runkle's testimony that those 4 or 5 properties would only have amounted to $1,000.

The Authority argues that the Contract required Totin to provide pre-construction photographs of each property and that Totin failed to do so. Michael Totin testified that he had photos of all of the properties, but the employee who had possession of part of them left Totin's employ and left the area with the photos, leaving Totin with only the photos along Route 18.

Adams testified, without rebuttal, that inspection of adjacent undisturbed areas can be a good gauge of the prior condition of the disturbed areas.

No notice was given to Totin by the Authority specifying deficiencies in Totin's work. The Authority notified the Surety's attorney by sending him a document entitled "Revised 12/10/01 Open Punch List Items." Totin was provided a copy by the Surety's attorney.

Totin argues that by practice and by contract, both sides are entitled to a final on-site joint inspection of any problems, concluding with a "punch list" of items needing attention. Hopefully, the parties agree. But, if they do not agree, the contractor has the owner's position before him, so that if he fixes those items, he is done.

Here, there was never a final on-site inspection, joint or otherwise; not as to the surface renovation, and not as to the paving. Totin had no way of knowing the items required to finish. Even the list of 12/10/01 doubled thereafter by the oral changes to the Runkle contract in September, 2002, purportedly pursuant to the oral unrecorded agreement of the Authority board.

Mark Reichard was an exceptionally active chairman of the Authority. He is to be commended for his public service and his diligence. In addition to conducting the Authority board meetings, he was active in the field, although construction was

not his area of expertise, checking the progress of the work on nearly a daily basis and making notes. Some of those notes have been quoted above. His testimony about work by Runkle was particularly persuasive in revealing the Authority's attitude to the restoration work. He testified that "we didn't go through a lot of detail on this with an eye to K–3; it was terminated." Thus, the atmosphere seemed to be that the Bankruptcy Court's Order removing the automatic stay so as to permit the Authority to terminate the Contract, if it thought it had grounds to do so, was equivalent to removing Totin as a party so that money due Totin could be arbitrarily spent elsewhere.

The same attitude shows up in the testimony of John Runkle, wherein he was instructed on the job "to make the owners happy"—"three or four times by Paul Hesse and every night be Mark Reichard."

This Court concludes that the oral extras to the Runkle Contract were not the result of defective work, but were concessions to homeowners' requests after seeing the improvements to other properties, without regard to the obligations of the Totin Contract.

Stephen Adams of Paul C. Rizzo Associates, Inc., Engineers & Consultants, was called as a witness. Adams has spent 20 years in the construction industry and in the past 5 years has investigated 40 to 45 construction projects. His inspection here was at the request of the Surety. He worked from the document entitled "Revised 12/10/01 Open Punch List Items," which is the same document sent by the Authority to the Surety's attorney and the same document attached as Exhibit 3 to the Authority's Answer. Adams inspected the listed properties twice; once on March 14, 2002, and again on July 10, 2002. The second inspection was to confirm vegetation growth. He took photos on each in-

spection and spoke to each landowner if possible. His reports (Both reports bear Exhibit # P–25) are credible, as was his testimony. Adams testified that the vegetation was returning, that it was well established, that certain depressions were likely caused by the separate contractor who installed the lateral connections, that there was no need for 500 tons of topsoil or 10,000 square yards of seed and mulch, that the condition of the disturbed areas could generally be ascertained from the adjacent undisturbed areas, and that even though roadway salt can have a damaging effect, there was not a problem with vegetation growth, but there was a problem with "ponding" in some areas which two truckloads of topsoil would cure.

This Court concludes that the surface restoration work left undone by Totin was of a value of $1,500.

### 7. Financial Adjustments

Totin's pretrial statement and the Authority's Final Compensating Change Order (Exhibit D–7) agree to a point. The Court recognizes the agreements and disagreements and concludes as follows under the Contract:

| | |
|---|---:|
| Contract price | 1,008,455.00 |
| Change Orders | 37,423.70 |
| Contract price prior to adjustment | 1,045,876.70 |
| Amount paid | 931,193.06 |
| Balance | 114,683.64 |
| Final Compensating Change Order (Exhibit D–7) | 22,767.70 |
| Balance due | 91,915.94 |
| Less agreed liquidated damages | 43,500.00 |
| | 48,415.94 |
| Plus 2194 square yards paving | 54,850.00 |
| Plus, due from Memo | 14,000.00 |
| Total | 117,265.94 |
| Allowed setoff herein | 1,500.00 |
| Balance due under Contract 3 without the Memorandum of Understanding | 115,765.94 |

■ However, in the Memorandum of Understanding, Totin gave up amounts due under the Contract, but agreed to be bound by the Final Compensating Change

Order. Totin knew he would come out ahead in the Final Compensating Change Order because of the paving to be done. He gave up other claim amounts.

Thus, the computation of the amount now due Totin is:

| | |
|---|---|
| Cash withheld | $ 14,000.00 |
| 2194 square yards paving | 54,850.00 |
| Total | $ 68,850.00 |
| Final Compensating Change Order | 22,767.70 |
| | $ 46,082.30 |
| Less allowed setoff herein | 1,500.00 |
| Net due Totin as of August 30, 2001 | $ 44,582.30 |

The difference between the $115,764.94 and the $44,582.30 ($71,182.64) is part of what Totin gave up in the Memorandum of Understanding on May 15, 2001, in order to get this job behind him. He did not anticipate that, after giving up $43,500 in liquidated damages, and $71,182.64 in amounts due under the Contract, that he would have to engage in protracted litigation in order to collect the remaining settlement amount.

The conduct of the Authority toward Totin was arrogant and unjustified. This Court will do what it can to rectify the abuse, subject to the prior agreements of the parties. Based on the representations of counsel early in the bankruptcy case, the Court viewed Michael Totin as an inept contractor. After five days of testimony, our opinion has reversed.

An appropriate Order will be entered.

### ORDER

This 7 day of July, 2004, after notice and trial, it is ORDERED that judgment shall be, and hereby is, entered in favor of Totin Contracting, Inc. and against the West Salem Township Municipal Sewage Authority in the amount of $44,582.30 as of August 31, 2001, plus interest at the legal rate from August 31, 2001 until paid.